

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 24, 2023

**VIA ECF**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    United States v. Kim Anh Vo, 19 Cr. 223 (NRB)

Dear Judge Buchwald:

The Government submits this letter with respect to the sentencing of defendant Kim Anh Vo, a/k/a "F@ng," a/k/a "SyxxZMC," a/k/a "Zozo," a/k/a "Miss.Bones," a/k/a "Sage Pi," a/k/a "Kitty Lee" ("Vo" or "the defendant"), which is scheduled to take place on February 23, 2023. For her participation in a conspiracy to provide material support and resources to a foreign terrorist organization, specifically, the Islamic State of Iraq and al-Sham ("ISIS"), Vo pleaded guilty pursuant to a plea agreement to one count of violating Title 18, United States Code, Section 371, resulting in an applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") sentencing range of 60 months' imprisonment, the statutory maximum. As part of that conduct, Vo worked as a member of an online group, the United Cyber Caliphate ("UCC"), committed to carrying out online attacks and cyber intrusions against Americans on behalf of ISIS, and recruited others to expand the UCC's reach and capabilities. For the reasons set forth below, the Government respectfully submits that a sentence consistent with the Guidelines of 60 months' imprisonment would be sufficient but not greater than necessary to serve the purposes of sentencing and would be fair and appropriate in this case.

## Relevant Background

On or about March 26, 2019, Vo was arrested pursuant to a criminal complaint (the "Complaint") charging her with conspiring to provide material support to a designated foreign terrorist organization, ISIS, in violation of Title 18, United States Code, Section 2339B. (Dkt. Nos. 1, 5.) The next day, Vo was indicted on the same charge. (Dkt. No. 6.) Vo's material support for ISIS included joining the UCC, knowing that its members pledged allegiance to ISIS and committed to carrying out online attacks and cyber intrusions against Americans and recruiting others to join the UCC and create content for ISIS, as discussed in greater detail below. (*Id.*) Vo's activities included attempting to disseminate ISIS propaganda threatening that "there will be blood today, tomorrow and until your last breath" and recruiting at least one minor (the "Minor") to

create content for the UCC, including a video and related posts of death threats targeting a nonprofit organization based in Manhattan and its leader. (PSR ¶¶ 38-41, 45-48.)

### A. Background on ISIS

Since 2004, the United States Secretary of State has designated ISIS as both a Foreign Terrorist Organization and a Specially Designated Global Terrorist entity. (PSR ¶¶ 11-13.) ISIS has notoriously committed systemic abuses of human rights and violations of international law, including indiscriminate killing and deliberate targeting of civilians, mass executions and extrajudicial killings, persecution of individuals and communities on the basis of their religion, nationality, or ethnicity, kidnapping of civilians, forced displacement of minority groups, and the killing and mailing of children, rape, and other forms of sexual violence. (PSR ¶ 14.) ISIS has recruited thousands of fighters from across the globe to travel to Iraq and Syria in order to engage in such terrorist acts and attempt to build its "caliphate," that is, to rule territory under its control, and leveraged social media and online technology to spread its violent extremist ideology as part of this recruitment and its efforts to attack the U.S. and other Western powers through terrorist acts around the world. (PSR ¶¶ 14-15, 17.) ISIS attacks against the West include a coordinated series of terrorist attacks in Paris, France in November 2015, killing 130 people; a series of bombings in March 2016 in Brussels, Belgium which killed at least 32 civilians; and the October 2017 vehicle attack in Manhattan, in which an attacker drove his vehicle into a pedestrian walkway, killing 8 people. (PSR ¶ 16.)

Since approximately 2014, ISIS's use of online communication platforms and social media began to involve the dissemination and promotion of attacks against the United States via cyber disruptions and intrusions, commonly referred to as "hacking," that involve the unauthorized access or debilitation of computers or similar devices, as well as online accounts or databases. (PSR ¶ 18.) These efforts have been led by a series of groups, including the "Islamic State Hacking Division," which published personal information threatening approximately 1,351 United States service members and government employees, and its successor, the "Islamic Cyber Army," and its subdivision, the "Cyber Caliphate Army" ("CCA"). (PSR ¶¶ 21-24.) On April 4, 2016, the CCA publicly announced a merger with other ISIS-supporting hacking groups under the single name of the UCC (United Cyber Caliphate), in order to increase and coordinate cyber operations against enemies of ISIS. (PSR ¶ 25.)

### B. Vo's Role in the Offense

Vo joined the UCC in April 2016, knowing it was an online group that pledged allegiance to ISIS and committed to carrying out online attacks and cyber intrusions against Americans. Since that time, the UCC and its sub-groups have disseminated ISIS propaganda online, including "kill lists," which listed the names of individuals – for example, soldiers in the United States Armed Forces and members of the State Department – whom the group instructed their followers to kill. For example, on or about April 5, 2016, one day after the CCA announced its merger to form the UCC, an undercover law enforcement officer (the "UC") engaged in a group chat with members of the UCC, including Vo, who posted an image of a social media post related to the consolidated formation of the UCC and identifying three of its "hacker teams" during the chat, and wrote in substance and in part, "LOL I am Isis." (PSR ¶¶ 30-31.) Weeks later, on or about April 21, 2016,

the UCC posted a kill list online of the names, addresses, and other personal identifying information of approximately 3,602 individuals in the New York City area with a message that stated: "List of most important citizens of #New York and #Brooklyn and some other cities . . . We Want them #Dead." (PSR ¶¶ 26-27.)

Between approximately April 2016 and May 2017, Vo worked on behalf of the UCC to recruit others to join the group and assist with the group's hacking efforts. In November 2016, Vo told the UC that she was "going to bring a special guest in . . . This person will take down all who stands in the way. And I will recruit during the way. But for it . . . I will recreate a new team I will not get under UCC but I'll be on the side working . . . Because going under UCC is to[o] risky" due to escalating law enforcement scrutiny. (PSR ¶¶ 32-33.) Between January and February 2017, Vo proceeded to recruit other individuals – including the Minor, who was residing in Norway – to create online content in support of ISIS. (PSR ¶¶ 38-48.) The content included a video ("Video-1") threatening a non-profit organization based in New York, New York, which was formed to find and combat the online promotion of extremist ideologies. Video-1 contained messages such as, "You messed with the Islamic State, SO EXPECT US SOON," followed by a scene displaying a photograph of the organization's chief executive officer and former U.S. Ambassador (the "CEO" or "Victim-1"), along with the words, "[CEO], we will get you," and a video of a man who appeared to have been shackled with his throat slit and bleeding. (PSR ¶¶ 46-48.) UCC members publicly disseminated the video through ISIS channels and social media accounts in or about early March 2017. (PSR ¶ 46.) On March 23, 2017, Vo communicated with the UC, discussing the possible deaths of two of her co-conspirators, and asked the UC to disseminate a message, stating in part:

> In the name of Allah. . . . [Co-conspirators] have won victory over the enemies who drill in the path of the righteousness. . . . The Islamic state cyber division has not lost. Drone us as much you can infidels! By the next morning you will find another kind of us ready to wage war of Jihad! . . . . We pledge to Abu Bakr Al-Baghdadi [then the leader of ISIS] the Islamic state will expand in regions across the seven seas. O'you infidentals do not think this is the end. There will be blood today, tomorrow and until your last breath.

(PSR ¶ 39.) Vo later discussed the "UK Shooting" with the UC, an apparently reference to the March 22, 2017 terrorist attack outside the British Parliament building in London, during which an attacker drove a car onto a sidewalk, killing four people and injuring another 50 people, before running toward another building and fatally stabbing a police officer. (PSR ¶ 40.) The attacker was himself shot by British authorities. (*Id*.) Vo stated, "Hey this gives me an idea use this recent success attack as a good example for the Iraqi campaign and target more countries… This is a valid opening for us if we do a message." (*Id*.)

On or about April 2, 2017, the UCC posted online a kill list containing the names and personal identifying information of over 8,000 individuals, along with links to another video ("Video-2"). (PSR ¶¶ 49-51.) Video-2 displayed messages stating, in part: "We have a message to the people of the U.S., and most importantly, your president Trump: Know that we continue to wage war against you, know that your counter attacks only makes stronger. The UCC will start a new step in this war against you. . . ." and "We will release a list with over 8000 names, addresses,

and email addresses, of those who fight against the US. Or live amongst the kuffar. Kill them wherever you find them!" In subsequent scenes, Video-2 contains what appears to be a graphic depiction of the decapitation of a kneeling man. (*Id*.)

As early as November 12, 2016, Vo discussed with the UC how a number of her co-conspirators had been detailed by the Federal Bureau of Investigation ("FBI"), stating that she "was off for a while because of this . . . Plus I got visited by FBI again so yea." (PSR ¶ 32.) Approximately nine months later, on or about July 6, 2017, Vo contacted the FBI and met with law enforcement on several occasions, in which she substantially admitted to her conduct. (PSR ¶ 28.) The investigation continued and Vo was ultimately arrested in 2019.

### C. Vo's Guilty Plea

On or about June 26, 2019, Vo waived indictment and pleaded guilty to a superseding information, charging her with the lesser offense of conspiring to provide material support and resources to ISIS in violation of Title 18, United States Code, Section 371, pursuant to a plea agreement. Vo admitted that she supported ISIS by joining the UCC, a "group that pledges allegiance to ISIS," and worked for the UCC by "recruiting, translating, and editing messages that they posted online." (Dkt. No. 14 at 14.) Vo acknowledged that she knew at the time that her conduct was "very wrong and highly illegal." (*Id*.)

## The Presentence Report

The PSR correctly calculates the defendant's Total Offense Level as 39. (PSR ¶ 68.) The defendant falls within Criminal History Category VI, because her offense involved a federal crime of terrorism. (PSR ¶ 72.) As a result, the Probation Office calculates that the applicable Guidelines range would ordinarily be 360 months to life imprisonment. (PSR ¶ 118.) However, because Vo was permitted to plead to a lesser offense carrying a statutory maximum sentence of 60 months' imprisonment pursuant to the plea agreement, the operative Guideline term of imprisonment is 60 months (the "Guidelines Sentence"). (PSR ¶ 118.) The Probation Office recommends a downward variance sentence of 44 months' imprisonment based on Vo's youth at the time of the offense, her lack of history of violence, and her acceptance of responsibility, remorse, and self-reporting to the FBI. (*See* PSR Sentencing Recommendation at 34-35.) By contrast, the defense seeks a variance of time served. The Government seeks a sentence consistent with the Guidelines Sentence, as set forth below.

## Applicable Law

The Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

## Argument

Vo stands before the Court convicted for her role in recruiting and creating content for ISIS through her work for the UCC. She actively aided the UCC's digital mission to promote ISIS's deadly cause, threaten and intimidate Americans, and to recruit others to do the same, including the Minor. Vo's participation in this crime merits a term of imprisonment within the Guidelines range. Under the circumstances, the Government believes that a substantial term of incarceration is necessary here.

First, such a sentence is needed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The offense conduct shows that Vo unabashedly served as a member of ISIS's consolidated cyber army, the UCC, planned to leverage ISIS's murderous attacks to spread its message, and recruited others to do the same, including by graphically threatening Americans such as Victim-1 with violence and death and the UCC's publication of "kill lists" encouraging the targeting of Americans for attack by ISIS followers. Moreover, this was not an isolated instance of criminal conduct; rather, Vo engaged in this crime as a member of the UCC for well over a year, persisting despite her clear knowledge that she and her co-conspirators were already under FBI scrutiny. While Vo came to eventually

accept responsibility and admit to her conduct, this cannot erase the seriousness of her crime and the severity of the harm she helped perpetrate. A Guidelines sentence is appropriate to address and punish her serious crime.

Second, a substantial sentence is necessary to afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). ISIS remains a pernicious global threat, and it continues to rely significantly on its online network and propaganda to recruit willing participants to its deadly cause and spread its message of terror. General deterrence is an important factor supporting a Guidelines sentence under these circumstances. Particularly here, where the defendant has already received leniency in the form of a plea to a lesser offense, resulting in a far more modest Guidelines Sentence than she would have otherwise faced, it is critical to send a strong signal to the community that material support for a vicious, violent terrorist organization such as ISIS will still result in a substantial term of incarceration. To combat ISIS's global presence, and deter others who might be tempted by its dark mission, it is important to make clear that participation in ISIS – even by a digital soldier hiding behind a keyboard – will be met with a significant prison sentence.

While the defense claims that specific deterrence is not necessary because Vo has been "rehabilitated," citing that she ultimately ceased her conduct after her interviews with the FBI, has pursued therapy, and appears to be now living a law-abiding life, *see* Def. Letter at 5, the extremity of her past conduct remains cause for alarm. Vo facilitated the operations of an international terrorist organization's cyber network, recruited foreign citizens including the Minor to its cause, and together with her co-conspirators, instilled terror in American citizens. As the Probation Department notes, this was "not a victimless crime as real individuals were fearful at the time and the victim company took steps to quell those fears and protect themselves" from terrorism at a substantial financial cost.[1] (PSR at 34 & ¶ 128.) Vo personally embraced ISIS's acts of deadly violence against civilians as "success attacks" and sought to spread ISIS's messages that "there will be blood today, tomorrow and until your last breath" for the "infidels" at the hands of ISIS terrorists. (PSR ¶¶ 39, 40.) Nor does the Government's prior consent to bail Vo reflect otherwise; Vo was bailed during a global pandemic solely so she could receive a specific opportunity to participate in the Disruption and Early Engagement Program ("DEEP") to mitigate the future danger she posed to the community. In reality, Vo's "motivation for participating in the instant offense appears partially unclear and complicated," and it is difficult to rest assured that she has truly rectified her conduct. (PSR at 34.) At the time of her crime, she was residing in a relatively stable home, performing well academically, and successfully graduated from high school to start college, all while living essentially a double life as an online terrorist operative. (PSR ¶ 86-87, 89, 102-103.) Even taking into account Vo's potential progress in the time since her criminal conduct, arrest, and guilty plea, the overall weight of the Section 3553(a) factors still counsel in favor of an incarceratory sentence, consistent with the Guidelines.

---

[1] Victim-1's organization is seeking restitution from the defendant to cover the costs of additional safety measures, including providing an active shooter class to employees, conducting cyber assessments, and enacting physical measures such as installing a bulletproof door. The amount sought was reported to the Probation Department as $170,176; the Government has since received an updated figure of $176,610.18 from Victim-1's organization, adding the costs of an alarm and security systems that was installed in Victim-1's residence in response to the release of the UCC's video threat.

## Conclusion

      The Government respectfully submits that a term of incarceration consistent with the Guidelines is appropriate for Vo and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing set forth in Title 18, United States Code, Section 3553(a). In addition, the Government respectfully requests that the Court impose restitution and forfeiture as appropriate.

      Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/_____
Kimberly J. Ravener
Assistant United States Attorney
(212) 637-2358

cc: Defense Counsel (via ECF)
    Sabrina Shroff, Esq.